## BENNETT v. COOK.

1. Findings of fact by the Circuit Judge from written testimony reported to him, approved, such findings not being against the weight of the evidence.

2. Where there is plenary proof of the gift of a chattel, subsequent declarations of the donor that a gift was not intended are inadmissible. Such declarations are only admissible when offered in reply to declarations introduced by the donee in support of doubtful evidence of the gift.

3. A parol gift of chattels cannot be made to take effect *in futuro*; there must be a delivery, but manual delivery is not essential.   Thus, where the donor resides with the donee, the chattels so given may, in a general sense, be already in the donee's possession.

4. The reservation of a right to ride a horse given to another is not inconsistent with the gift.

Before HUDSON, J., Hampton, June, 1887.

This was an action by William J. Bennett as administrator of James Hughey, deceased, against Joe Cook, commenced February 2, 1886, to require defendant to deliver possession of certain chattels and choses to plaintiff, and for injunction. The testimony so far as the same is material to the points considered and exclusive of that which is held to be irrelevant and incompetent, was as follows:

PLAINTIFF'S EVIDENCE.

*W. J. Bennett:* I am administrator of James Hughey, plaintiff in this action.   I know of a portion of the property in this action;

Mr. Hughey owned property; Mr. Hughey lived at Joe Cook's; died 9th or 10th January, 1886, in Hampton County. Mr. Hughey had real estate up to year before he died; sold one piece to Ben Heape; no claims have been handed in by creditors; no notice has been given to creditors. I heard that there were claims against the estate. All the property set forth in the complaint was Mr. Hughey's. Cart was worth $20, gun worth $15, furniture worth $10 or $15, fodder worth 75 cents per hundred— 1,000 pounds, worth $7.50.

*John Hughey:* Was present in 1884, and paid $40 for a horse to W. M. Bennett, agent for Geo. Hoover, for his father; did not promise to pay any more.

X. The cream horse of his father was worth $125. The cream horse was not the one bought from W. M. Bennett, agent for Hoover.

### DEFENDANT'S EVIDENCE.

*Joe Cook:* I knew James Hughey; he is dead; died at my house 9th January, 1886; had been in bad health for a long time—sometimes in bed, sometimes up—until about ten days before he died. I went for physician for him; told physician I would see him paid. I had in my possession everything he had; had been in possession of all the property in the complaint, horse, &c., one note on Mr. Harvey, one on Mr. Stanley. Hughey died at my house; moved there three or four months before his death; health was very bad; no one was living with him prior to his moving to my house. I never tried to collect the notes. Not many days after Mr. Hughey's death I told Mr. Harvey that Mr. Hughey advised me before his death not to collect the principal of his note, only the interest. He never owed any money that I knew of; was in the habit of paying his debts; had loaned money for 15 years previous to his death. Mr. Hughey had $1.50; offered it to my wife. I paid doctor's bill; had him buried. Dr. Vincent attended him in his last illness.

X. I got the notes out of a trunk that had been Mr. Hughey's. I stated to the probate judge that I got the notes out of his (Mr. Hughey's) trunk, or what had been his. I got the notes out of the trunk second or third day after Mr. Hughey's death. I was worried about them, and wanted to secure them. Trunk which

was in my house about one week or so prior to his death. Trunk was not in Mr. Hughey's room, and contained other papers that did not amount to anything, and may be one or two pieces of clothes.

*Rev. James E. Davis:* I was personally acquainted with Mr. James Hughey since 1851; greater part of that time I lived near him, until 3 years previous to his death. Was about him frequently; never saw the heirs who are claiming this property visit him. Stayed about him from 1851 to 1869; lived about one mile from him; knew him all the while, from 1869 to 1882. I moved away; did not see him often. In 1882–83–84 Mr. Cook paid him a good deal of attention, during which time he was quite ill. Cook was working at steam mill at the time; came to see him when he could. I never did see any of the other children (claiming) come to see him except Mr. Bennett in 1882–83. Could not say who attended him in last illness.

X. Mr. Hughey was in good circumstances; had money; brought his notes to me to compute the interest; had money loaned out.

XX. He was not a man to go in debt; if he owed money, it must have been a small amount.

*Charlie Shaffer:* I know Mr. Hughey; was at his house before his death; had a conversation with him a week or two before. Was sickly a year or two before; was sitting up; living with Cook and wife. A week or two before his death says he was in a poorly state; did not know how long he was going to live. I told him he ought to do something with it; he said what he had belonged to Joe Cook and wife for kindness from them; Cook carried victuals to him when he was sick; was not able to cross foot-logs. Died at Cook's house; the friends around buried him; none of the family were there. Hughey said he did not want any of his other children there. Cook had charge of everything.

X. I had conversation with John Hughey after burial; he asked me if I knew what disposition he (Mr. James Hughey) had made of his property. Mr. Hughey (James) told me that John had took $700 from him, and he did not intend to give him anything. The day before Mr. Hughey was buried, I did not put my eyes on John Hughey. If I told Mr. John Hughey that I

heard Mr. James Hughey say what he intended to do with his property, I don't recollect it. I had a conversation with Wm. Bennett about a week after Hughey's death. Mr. Bennett asked me if I knew anything about Mr. Hughey's property (I believed he asked). I told him I know nothing about it. I don't deny telling Mr. Bennett that it was strange that Mr. Hughey had not done something with his property. About two or three weeks before he (Mr. Hughey) died, I wanted to borrow some money from him. Mr. Hughey said he had no money on hand, but was going to collect some on some notes, and when he did he would let me have it. Mr. Hughey took a trip to Barnwell (sometimes took trips when he was able); rode on cream horse; was only horse on the place, and could not walk; did not offer to sell to me or any one else. Had a conversation with Mr. Hughey in piazza one week or ten days before he died; was sitting up and walking round in yard; did not ask him then about the money to loan; our conversation about his property. I will swear to exact words of Hughey. Asked him if he was going to send for his children; he said no; he didn't care for them. I asked him, How are you agoing to make it about the property? He said, "when he should die, if he knew that if any of his children would get anything of it, he would burn it to ashes himself;" (re-expressed by Mr. Shaffer): "He said that if he knew that after he died, any of the other children should reap the benefit of it, he would burn it to ashes himself." "He said that what he had around him was for Mr. Cook and wife and children." And this was everything Mr. Hughey said about his property. I married Mr. Cook's sister.

XX. I am a foreigner; do not understand the English language well.

*Rev. Wm. Weekly:* Mr. Hughey paid me a visit. After dinner, I said to him, "Jimmie, don't let me hear tell of you going back to your old place any more." I said to him, "You are getting old, and you are able to pay your board." He said, "I have moved to Joe Cook's for some time." He said, "I don't intend to live by myself any more; all I've got I've carried to Joe Cook's and there is where I expect to stay till I die, and this horse I have given to Cook on condition that when I want to ride

he is my horse, and when I have no use for the horse, it's Joe Cook's, and all that I have." Mr. Hughey said that he advised Joe Cook to sell his (Cook's) horse and take this horse.

*J. C. Searson:* I knew Hughey 25 or 26 years; lived about 1 mile from me. Know Joe Cook and wife. Mr. Hughey adopted Eliza Cook when quite small. Was at Hughey's when Cook married her. Cook moved back to Hughey's (Cook and wife) in latter part of summer previous to Hughey's death. Hughey was ill. Hughey told me that they (Cook and wife) nursed him. Hughey died at Cook's house. Never knew him to owe money; had loaned money for 15 or 18 years.

X. He (Hughey) told me he had given Cook the horse; that he had reserved the right to ride the horse on church days. .

XX. Three or four years ago I met Mr. James Hughey in the road. I asked him where he was going; told me he was going across Coosawhatchie swamp to try to get Cook and wife to come back, and if they would do it, he would give them a piece of land across the branch. He wanted them, for he was old and had no one to do anything for him; he had to cook and wash for himself. In December after Hughey moved to Cook's, 4 or 6 weeks before his death, I offered to buy horse from Hughey; he refused and said he had given everything he had to Cook and wife, and they were to take care of him till he died; told me he had $400 dollars 3 or 4 years before he died.

*Dr. C. P. Vincent:* I knew James Hughey. Attended him in last illness. Joe Cook came for me. Lived 3 or 4 days after I was called to see him. Was conscious up to his death. Hughey was at Joe Cook's when he died; considered him in right mind.

X. Mr. Cook mentioned that he would be responsible for my pay. Would have gone any way. Mr. Cook paid me for previous bill against Mr. Hughey in November. That was not an engagement of Mr. Cook's. John Hughey came for me for that visit. Mr. Hughey was at his own residence on first call; John Hughey waiting on him—no one else—which was 5 or 6 months before his (Hughey's) death.

X. Mr. Cook paid me $11.00; don't know how long after; think it was a month or two.

XX. Mr. Cook paid me through Mr. Walsh. Mr. Cook and wife were kind and attentive to Mr. Hughey.

### EVIDENCE IN REPLY.

*William Priester:* On last Christmas eve went with Mr. Hughey—went as far as Bill Stanley's. Hughey was on cream horse; this was about 20 odd miles from Mr. Hughey's home. Hughey came up to my house; offered to sell his horse; price $150. I saw him with money (silver); he had pocket bag with draw strings. He said he wanted to trade horses, as I (Priester) had one he could get up on better than his.

X. He was not under the influence of whiskey. He was there 3 or 4 days, and frequently brought in about the horse.

*Mr. B. F. Walsh:* I knew James Hughey. I rented from him. He made a crop the year he died. I worked on one or two occasions in it. Every time I was there he had plenty of provisions. I took several meals with him. John Hughey attended to him. I saw Mr. Joe Cook there, but not many times, the year before he died. John Hughey worked there. Hughey sold the land. Ben Heap has it in possession. Hughey moved off in the fall.

X. I lived 2 or 3 miles from Hughey place in 1885. He offered to sell me the horse 1 month (probably more than 1 month) before he died. I bought a horse from Joe Cook.

*John Hughey:* I lived short mile from Joe Cook in January, 1886; in 1885 stayed with B. F. Walsh. I ploughed for James Hughey, and pulled his fodder and did his cooking while I was there. He had corn on hand. When bacon gave out, he gave me money to buy it. Mrs. Joe Cook never came on the place while I was there. Mr. Jas. Hughey picked cotton and worked when not down sick. The corn he made on the place was moved to Dan Padgett's; the fodder was left in the stack on the ground where it was made; I and my father (Jas. Hughey) stacked it. Mr. Joe Cook moved on the place, I think, before 1885. I don't know whether he (Joe Cook) had corn or not; I did not visit him, because he had forbidden me to come on his place, when Mr. James Hughey died. Joe Cook moved the corn and fodder after Mr. Jas. Hughey's death. I plowed the cream horse in

1885. I saw my father (Jas. Hughey) about December 25, before he died, for the last time; he was riding the cream horse on December 25, 1885. I was not informed of my father's illness till after he died. I was out with Joe Cook and he with me. I am not contending for this property. Have not been offered any sum of money by any of the parties. Joe Cook's wife is my sister. I have been going by the name of Hughey all my life; was raised by James Hughey; had quit him for several years; had been back with him three or four years. My father raised me till four or five years before his death. The heirs who are claiming this property, during my stay with him, visited him very little.

*Dan Padgett:* In winter of 1885, James Hughey, now deceased, moved lot of corn—about sixty bushels—to my place, and left same there until he could get sale for it. This corn remained on my place until a few days after the death of James Hughey, when same was hauled off by Joe Cook. Corn was worth 75 cents a bushel.

Other matters are stated in the opinion of the court.

*Messrs. W. S. Tillinghast* and *James W. Moore,* for appellants.

*Messrs. Searson & Warren,* contra.

April 3, 1888. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. James Hughey becoming old and infirm, and finding himself alone and without any one of his immediate family to take care of him, sold his little tract of land and went to live with the defendant, who had married his adopted daughter, to whom he was attached. Upon the occasion of his removal, he seems to have carried with him a horse, about sixty bushels of corn, a gun, a few pieces of old furniture, and some notes, amounting in value, as alleged, to about $800. He was received and treated kindly by the defendant and his wife. They nursed him in his last illness, employed and paid for what medical attention he wanted, and in about six months thereafter he died intestate, leaving his property in their possession.

Soon after the death of the intestate, the plaintiff, who had mar-

ried a daughter of the deceased, applied for letters of administration upon the estate, and before the time had elapsed for obtaining full letters, he received some authority, in the nature of letters *ad colligendum bona,* to gather up the goods of the deceased, and sued the defendant for the aforesaid property. The defendant answered, claiming title to the property which remained by parol gift from the intestate in his life-time, the inducing cause or consideration being the love and affection to his wife, the adopted daughter of the deceased, and the services rendered the intestate in his old age and helpless condition by the defendant and his wife.

It was referred to a referee to take the testimony, much of which consisted of the "declarations" of the intestate that he "had given" or "intended to give" the property to Cook and wife, and was taken subject to exception. It is all printed in the Brief. The cause came on to be heard by Judge Hudson, who ruled that all the testimony of both the plaintiff and defendant, touching transactions and communications of the witnesses with the deceased, must be stricken out under section 400 of the Code; and that all the testimony of other witnesses in behalf of the plaintiff as to declarations of the deceased in support of his title and against the gift, must also be stricken out. The judge in his decree says, "After eliminating from the case all this incompetent and irrelevant testimony, and after considering the other testimony, I find that the great weight of the evidence is in favor of the title of the defendant and wife, and is against the claim of the plaintiff. * * * I find as matter of fact that the intestate at the time of his death did not own the property in dispute, having given the same to the defendant and his wife, and hence the plaintiff cannot recover," and dismissed the complaint.

From this decree the plaintiff appeals upon exceptions: I. Because, it is respectfully submitted, that his honor erred in ruling that all the testimony of witnesses in behalf of the plaintiff as to declarations of deceased in support of his title and against the gift must be stricken out, testimony of like nature in support of the gift having been previously introduced by defendant. II. Because his honor erred in finding that the great weight of the evidence is in favor of the title of the defendant

and wife, and is against the claim of the plaintiff.    III. Because his honor erred in finding that this case is similar in the character of the proof of the gift, to the case of *Blake* v. *Jones* (*Bail. Eq.*, 142), it being respectfully submitted that there is no parallel between the two cases.    IV. Because his honor erred in finding that the delivery was made, as far as is usual under like circumstances, and that the defendant and wife had possession of the property, sufficient to amount to a delivery.    V. Because his honor erred in finding that the plaintiff gave the horse to defendant and wife, for immediate use as their horse.    VI. Because his honor erred in finding that the plaintiff had no right to any of the property traced to defendant's possession, and named in the complaint.    VII. Because his honor erred in finding that defendant had only one dollar and fifty cents in his possession of the money of the intestate, and that he had offered to turn over the same to plaintiff.    VIII. Because his honor erred in deciding that the intestate did not, at the time of his death, own the property in dispute; that he had given the same to defendant and wife; and adjudging that the complaint should be dismissed.

There are no rights of creditors in the case.    The intestate seems to have been punctual in paying his debts, and the only contest is between the heirs at law and the defendant.

The general rule of evidence certainly is, that declarations are admissible against the interest of the party, but not in his favor. "There is, perhaps, no principle better settled than that, when one has entered into a contract, made a gift, or done any other act, by which he is bound, he cannot by any subsequent act or declaration of his own avoid or discharge himself from it.    If, then, the gift by the testatrix to the defendant's wife was proved, her subsequent declarations were, upon general principles, inadmissible, for the obvious reason that they were irrelevant.    They were therefore properly rejected.    Cases do sometimes arise, in which proof of the gift is made up of repeated declarations of the donor, running through several years, where such declarations are brought in by the party claiming under it in support of doubtful evidence of the gift.    In these and such like cases, such declarations are admissible, in reply to such evidence.    The case

of *Sims* v. *Saunders, Harp.*, 374, is an illustration of this."
*McKane* v. *Bonner,* 1 *Bail.*, 116.

It seems that in respect to alleged parol gifts, proof of declarations of the donor is only allowable in doubtful cases upon the question of gift or no gift, and the evidence on both sides consists of declarations of the alleged donor. The doctrine is clearly exceptional in character, and as it trenches closely on forbidden ground, it should not be allowed to go beyond the necessity of the case, and then be received with great caution. "Where there has been plénary proof of the gift, subsequent declaration of the donor that a gift was not intended, is inadmissible." *McKane* v. *Bonner, supra.* It seems that the Circuit Judge was entirely satisfied, "from the great weight of the evidence," that "plenary proof of the gift" had been made. And according to the well established rule of this court, that finding of fact will not be disturbed, unless it is against the weight of the evidence, which we have read and considered. We cannot say there was error of law in excluding the subsequent declarations of the intestate tending to controvert the gift previously made.

But it is strongly urged upon us that there was no sufficient proof of gift perfected by a delivery—that the whole evidence, taken together, showed, at the most, an intention to give at the death of the donor, which was testamentary in character, and void as being in conflict with the law as to wills. The question whether there was a delivery was also a question of fact, which the Circuit Judge has decided. It is said, however, that his view of what, under such circumstances, would constitute a legal delivery, was error of law. There is no doubt that a parol gift of chattels cannot be made to take effect *in futuro.* To constitute a legal gift there must be an actual or constructive delivery of possession so as to confer the right of enjoyment *in presenti.* The rule seems very plain; but there are so many kinds of personal property, and circumstances are so various, there is often no little difficulty in applying it properly.

It has been settled that it is not necessary that there should be in all cases an actual manual delivery. The principle is stated thus: "Property in a chattel cannot be transfered by a parol gift without delivery; but by delivery is not meant an actual manual

delivery in all cases, but any circumstances amounting to a clear demonstration of the intention of the one to transfer, and of the other to accept, and which puts it into his power, or gives him authority to take possession, is all that is necessary, and is a fact that is left to the jury." *Reid* v. *Colcock*, 1 *Nott & McC.*, 592; *Hatton* v. *Banks*, *Ibid.*, 221; *Blake* v. *Jones, admr.*, *Bail. Eq.*, 141. The latter case, as remarked by the Circuit Judge, "is very similar in the character of the proof" to this. In that case it was held that "when a donor has repeatedly declared his intention to give, his subsequent admissions that 'he had given' are sufficient evidence of an actual delivery to complete the title of the donee, when it does not appear that the declarations were loose and playful, and particularly when the donor was under a moral obligation to make the gift."

Indeed, upon the point of delivery, this case is stronger than that of *Blake* v. *Jones*, for there the slaves recovered by a daughter from the administrator of her father were never in the actual possession of the donee. The father had said: "When you get a plantation I will send them to you, and in the meantime I might as well pay you hire as any one else." While here the property, at the time of the death of the alleged donor, was already in the possession of the person claiming as donee. It may be said that this arose from the accidental circumstance that the intestate, at the time of his death, was living with the defendant; but it seems to us it is a circumstance entitled to some consideration, at least in this, that at the time of the alleged gift there was no occasion to make a visible transfer of the possession (the usual evidence of such a gift), for the defendant was already in possession in a general sense.

We see no reason to except the "cream horse" from the other property. It appeared from the testimony of Weekly, Searson, Shaffer, and others, that the intestate, three or four weeks before his death, said: "I have moved to Joe Cook's for some time—I don't intend to live by myself any more. All I've got I have carried to Joe Cook's, and there is where I expect to stay until I die, and this horse I have given to Joe Cook, on condition that when I want to ride he is my horse, and when I have no use for the horse, it's Joe Cook's, and all that I have." Where the gift

of a slave was absolute in its terms, and accompanied with delivery of possession—held, that the reservation of a right "to borrow" under certain circumstances, or to receive "something like hire," if the donor should stand in need, was a "condition subsequent, and did not invalidate the gift, although made by parol," &c. *McKane* v. *Bonner, supra.*

The judgment of this court is, that the judgment of the Circuit Court be affirmed.